| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>EASTERN DISTRICT OF NEW YORK<br>-----------------------------------------------------------x<br>In re<br><br>WILLIAM VIDRO,<br><br>     Debtor.<br>-----------------------------------------------------------x<br>FLUSHING SAVINGS BANK, FSB, et al.,<br><br>     Plaintiff,<br> - against-<br><br>WILLIAM VIDRO,<br><br>     Defendant.<br>-----------------------------------------------------------x<br>KENNETH P. SILVERMAN, as SUCCESSOR<br>TRUSTEE of the BANKRUPTCY ESTATE of<br>WILLIAM VIDRO,<br><br>     Plaintiff,<br> -against-<br><br>WILLIAM VIDRO,<br><br>     Defendant.<br>-----------------------------------------------------------x | <u>FOR PUBLICATION</u><br><br><br>Chapter 7<br><br>Case No. 11-78629-dte<br><br><br><br><br>Adv. Pro. No. 12-08122-dte<br><br><br><br><br><br><br><br><br>Adv. Pro. No. 12-08209-dte |

## MEMORANDUM DECISION

*Appearances:*

| | |
|---|---|
| Jaspan Schlesinger, LLP<br>*Attorneys for Plaintiff Flushing Savings Bank, FSB*<br>By: Frank C. Dell'Amore, Esq.<br>300 Garden City Plaza<br>Garden City, NY 11530 | Weinberg, Gross & Pergament, LLP<br>*Attorneys for Defendant Debtor*<br>By: Marc A. Pergament, Esq.<br>400 Garden City Plaza, Suite 403<br>Garden City, NY 11530 |
| Weiss, Zarett, Brofman & Sonnenklar, P.C.<br>*Attorneys for Plaintiff Chapter 7 Trustee*<br>By: Michael D. Brofman, Esq.<br>3333 New Hyde Park Road, Suit 211<br>New Hyde Park, NY 11042 | |

Before the Court is the motion of William Vidro, the Defendant Debtor, for a directed verdict to dismiss this adversary proceeding with respect to the claims of Flushing Savings Bank, FSB ("FSB") and the chapter 7 Trustee (the "Plaintiffs"), that the Defendant should be denied a discharge pursuant to 11 U.S.C. section 727(a)(2)(A). This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(J) and 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(5). Based upon the uncontested facts listed in the parties' joint pretrial statement and testimony of the Defendant, and his non-debtor spouse, Ellen Vidro (hereafter "Ellen"), which was presented to the Court on behalf of the Plaintiffs' primary case, the Defendant's motion for a directed verdict is denied.

## BACKGROUND

Prior to the Debtor's chapter 7 filing on December 12, 2011 (the "Petition Date"), Defendant was an investor in an entity known as Motion Imaging, Inc. ("Imaging"). FSB issued a line of credit to Imaging which was personally guaranteed by the Defendant on September 26, 2007. A default occurred on the line of credit owed to FSB by Imaging on September 1, 2008. FSB sent a Notice of Default to the Defendant on February 11, 2009 and subsequently sued the Defendant in state court based on his personal guaranty.

Prepetition, the Defendant had worked at Schoenfeld Group Holdings LLC ("Schoenfeld"). When the Defendant left Schoenfeld, he entered into a severance agreement dated January 1, 2008 (the "Severance Agreement"). Under the Severance Agreement, the Defendant would receive a one year draw, which was approximately $270,000 for 2008, and three years of profit and loss participation. The debtor received the $270,000 representing the one year draw on a bi-weekly basis throughout the course of 2008. As for the profit and loss

1

participation, the Defendant was entitled to one and a half percent of Schoenfeld's profits for the year if there were profits.

On December 24, 2008, the Defendant's wife Ellen (hereafter "Ellen") executed a general power of attorney (the "Power of Attorney") authorizing the Defendant to conduct banking transactions in bank accounts that were in her name. This allowed the Defendant to sign checks and withdraw funds from any bank account that is in Ellen's name. On January 27, 2009, a bank account ending in 6052 was opened in Ellen's name at Signature Bank ("Ellen's 6052 Account"). After December 24, 2008, the Defendant, using this Power of Attorney, conducted banking transactions using Ellen's 6052 Account. The Defendant testified that the purpose of creating Ellen's 6052 Account was to have Ellen learn how to handle their finances should the Defendant no longer be available to do so. Ellen testified that she was not employed and had little to no independent income during 2006, 2007 and 2008. June 3, 2013 Trial Tr. 15:12-20. She also stated that she did not write checks. After the creation of Ellen's 6052 Account, the Defendant continued to be the sole person handling all the banking transactions for himself and the household using the Power of Attorney. During 2009, 2010 and up to the Petition Date in 2011, Ellen never reviewed bank statements of any accounts in her name.

After the Defendant received FSB's Notice of Default, the Defendant received approximately $1,992,161.48 from Schoenfeld on February 27, 2009, part of which represented the profit and loss participation percentage for the 2008 year and the rest was the Defendant's balance from his capital account at Schoenfeld. The funds where wire transferred into the Defendant's joint checking account ending in number 8221 which he had with Ellen at Signature Bank (the "8221 Account").  Of the $1,992,161.48 the Defendant received, $1,940,000 was

spent in March of 2009 and $51,146.22 was spent in April of 2009. Of the $1,992, 161.48, an aggregate of $700,000 was transferred to Ellen's 6052 Account to set aside funds to pay the Internal Revenue Service ("IRS"). On March 27, 2009, the Defendant wrote a $550,00 check from Ellen's 6052 Account to the IRS.  Afterwards, the Defendant then wrote three checks in the amount of $100,000, $20,000 and $28,000 to Ellen from her 6052 Account and the Defendant had the checks deposited back into the 8221 Account in May of 2009.

On July 21, 2009, FSB commenced an action against Motion Imaging, the Defendant, Robert Thompson, Steven D. Navon and John C. Conkling in New York state court (the "State Court Action"). The individual defendants in the State Court Action had guaranteed FSB's loan to Imaging.

In addition to the 8221 Account, the Defendant had a bank account he used to keep track of the income and expenses relating to the Defendant's business of owning/investing in race horses (the "Old Horse Account"). Upon the advice of Defendant's counsel, the Defendant closed the Old Horse Account.  April 22, 2013 Trial Tr. 44:8-17.  After the Defendant closed his Old  Horse Account in August of 2009, he opened a separate horse account under Ellen's name (the "New Horse Account"). Ellen was not involved in the management of the Defendant's horse business. All the money that went into the New Horse Account was the Defendant's money and the money that went out related to the expenses for the Defendant's horses. Ellen did not know what was going in or out of the horse account in her name. Defendant would write out the checks from the New Horse Account for Ellen to sign.

Approximately two months after the commencement of FSB's action, the Defendant closed this 8221 Account. Afterwards, most of the checks received by the Defendant in his name

would be deposited in Ellen's 6052 Account and any withdrawals that needed to be made would be done using the Power of Attorney. The Defendant also closed his 8221 Account on the advice of his attorneys. April 22, 2013 Trial Tr. 44:8-17. From September of 2009 to the Petition Date, the Defendant conducted all his banking transactions by depositing whatever money he received in Ellen's 6052 Account or the New Horse Account, and withdrew funds and wrote checks using the Power of Attorney.

In September or October of 2009, after the State Court Action commenced, Defendant stated that he and the other guarantors met with FSB in hopes of obtaining a resolution. However, nothing got resolved from this meeting. April 22, 2013 Trial Tr. 89-92.

On December 18, 2009, the Defendant entered into an agreement to sell his right to receive his profit and loss participation from Schoenfeld for the 2009 and 2010 years to Stepdenn for $175,000 (the "Stepdenn Agreement"). The law firm currently representing the Defendant drafted the Stepdenn Agreement. April 22, 2013 Trial Tr. 49:10-17. Stepdenn was an entity created to enter into this purchase agreement and the principals of Stepdenn consisted of the Defendant's friend and former colleague at Schoenfeld, Stephen Ginsberg, and the Defendant's brother-in-law, Dennis Maier. The Defendant used most of the $175,000 he received to (a) prepay 9 months of his step-daughter's mortgage with Everhome Mortgage Company, (b) prepay approximately 6 months of his own mortgage against his Residence in the amount of $31,298.88, (c) pay the real estate taxes for his Residence of approximately $22,233.13, (d) pay the Defendant's legal fees in the amount of $10,000, (e) pay some of the credit card expenses, and (f) pay some utility expenses. Soon afterwards, Dennis Maier requested a $25,000 loan from Ellen. Through Ellen, Defendant gave Maier $25,000 which came from the

$175,000 the Defendant received from Stepdenn as those were the only funds in the 6052 Account at the time the $25,000 loan was given. There was no promissory note created for the $25,000 loan.

When the Defendant received monies from Schoenfeld for the 2009 and 2010 years, the Defendant would either endorse the checks and have them deposited into Stepdenn's bank account or he would deposit the checks into the 6052 Account and then have a check written to Stepdenn. Between Late December 2011 and early January 2012, the Defendant received $169,031 under the Schoenfeld Severance Agreement for the 2010 year. The debtor retained $100,000 and paid the balance to Stepdenn. The Defendant produced a promissory note stating that the $100,000 retained by the Defendant constituted a 3-year loan by Stepdenn to the Defendant with a maturity date of January 1, 2015 with interest payable at 5% per annum. There is no indication whether Defendant made any interest payments under the note. Other than the promissory note, there is no evidence of any consideration given by the Defendant to Stepdenn for the $100,000. The income received from Schoenfeld for the 2009 and 2010 years were reported on the Defendant's K-1 from Schoenfeld. The Defendant did not issue any tax documents to Stepdenn with respect to the monies distributed to it or any monies above the $175,000 Stepdenn paid.

On or about March 22, 2010, the Defendant and Ellen transferred legal title in their marital residence located at 8 Greenwood Lane, Woodbury, New York (the "Residence") to Ellen and the Defendant's step-brother, Mark Dorfman, as tenants in common. Although the contract of sale provided for a purchase price of the Defendant's interest in the Residence as $635,000 with $560,000 being pursuant to a purchase money mortgage and $75,000 in cash at

closing, the Defendant only received the $75,000. A purchase note and mortgage were never executed in favor of the Defendant. After the transfer, the Defendant and Ellen continued to reside at the Residence.  Mr. Dorfman did not reside at the Residence. The Defendant and Ellen also continued to make mortgage payments, pay the property taxes associated with the Residence, maintain insurance and pay for the general upkeep of the Residence. In addition, the Defendant continued to take deductions for mortgage interest and property taxes on his tax returns.

On March 29, 2010, a week after the Defendant transferred his interest in the Residence to Dorfman, the Defendant entered into an agreement (the "Peters Settlement Agreement") to transfer or grant a security interest to Mark Peters in the Defendant's interest in and to allocations and distributions with respect to the Defendant's interest in POAL Four Corners Partners II LLC ("POAL") and U.S. Oil and Gas Acquisition and Development Fund II LP ("US Oil").  Defendant testified that he wanted to increase his investment in Satellite Associates ("Satellite").  Satellite was created by the Defendant as a vehicle to lend money to Imaging and subsequently, it was also a means for the Defendant to invest money in Imaging.  Defendant stated that he didn't have any money at the time to increase his investment so he asked Peters to invest another $300,000 to the $300,000 original investment that Peters made into Satellite. Defendant testified that he was required to guarantee Peters' entire $600,000 investment when the Defendant asked Peters to invest another $300,000 in Satellite. Of the $1,992,161.48 the Defendant received from Schoenfeld under the Severance Agreement in 2009, the Defendant made a payment of $650,000 to Satellite in March of 2009 in order to increase his investment in Satellite and to allow Satellite to return the $300,000 of additional capital invested by Peters and

another $300,000 invested by Herb Cohn at the Defendant's request. However, there is no explanation as to why the Peters Settlement Agreement is dated March 29, 2010 if the investments in Satellite by Peters to which it purportedly relates occurred more than a year earlier and $300,000 of the guaranty was satisfied by the Defendant in or around March of 2009. There is no explanation as to the consideration provided by Peters with respect to the Peters Settlement Agreement. Moreover, distributions with respect to POAL and US Oil were reported on the Defendant's tax returns and the Defendant did not provide Peters with any tax documentation regarding the distributions the Defendant received.

On April 6, 2010, a $1,595,294.70 judgment was awarded in the State Court Action in favor of FSB against the Defendant, Imaging and the other individual guarantors of the debt owed by Imaging to FSB (the "Judgment"). The Judgment was entered by the Nassau County Clerk's Office on April 8, 2010. As of the Petition Date, the amount of the Judgment plus interest was $1,814,614.52.

In October of 2010, Defendant made an application to the IRS for a tentative refund which carried back losses he had incurred in 2009 to the 2006 and 2007 years. In February of 2011, the Defendant and Ellen received a check dated February 4, 2011 from the IRS made payable to them both in the amount of $285,337.22. When the Defendant had initially attempted to deposit the check in the 6052 Account, the bank required the debtor and Ellen to open a joint account to deposit the check. A joint checking account under number ending in 4867 was opened on February 10, 2011 (the "4867 Account") and the check was deposited on the same day. On February 11, 2011, all the funds in the 4867 Account were transferred to a checking account in Ellen's name ending in 3887 and the 4867 Account was closed after a few days.

On December 10, 2011, two days prior to the Petition Date, Dorfman and Ellen transferred legal title in the Residence back to the Defendant and Ellen for no consideration. The legal title in the Residence was transferred back to Ellen and the Defendant because the Residence was being sold but the proposed buyer could not get title insurance because of the State Court Action against the Defendant. The Residence was sold post-petition for $1,425,000. FSB received $100,000 and the Defendant and Ellen received $104,000 from the proceeds of sale. The Defendant considered half of the $104,000 to be his and the other half to be Ellen's. After the sale of the Residence, Dorfman received $20,000 from one of Ellen's accounts. Defendant testified that he did not and does not have any plans to transfer any further moneys to Dorfman for the transfer of legal title in the Residence back to the Defendant in December of 2011. April 22, 2013 Trial Tr. 104:5-19.

The Defendant's bankruptcy schedules do not list any cash on hand or bank accounts. The schedules list an interest in stock of Imaging and a partnership interest in Satellite with both of these interests having a value of $0.00. Defendant's Schedule A to the bankruptcy petition lists a joint ownership interest in the Residence that the Defendant valued at $1,425,000. At the time of the bankruptcy filing, the Defendant had two mortgages with Chase against the Residence for a total of $1,079,799.80. There were also judgments against the Defendant arising out of the Defendant's business debts, along with the one held by FSB.

On April 13, 2012, FSB commenced an adversary proceeding objecting to the Defendant's discharge pursuant to 11 U.S.C. § 727 ("FSB Action"). On May 17, 2012, Neil Ackerman, the initial chapter 7 Trustee appointed to the Defendant's bankruptcy case, commenced a separate adversary proceeding also objecting to the Defendant's discharge under §

727 (the "Trustee Action"). Kenneth Silverman was subsequently substituted for Mr. Ackerman as the Trustee of the Defendant's bankruptcy estate and continued as the Plaintiff in the Trustee Action. Pursuant to a Stipulation and Order dated June 19, 2012, the FSB Action and Trustee Action were consolidated for purposes of discovery and trial.

A bench trial on whether the Defendant should be denied a discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(5) commenced on April 22, 2013 and continued on May 28, 2013 and on June 3, 2013. Plaintiffs argued that a denial of discharge under §727(a)(2)(A) is warranted because the Defendant removed, concealed, or transferred property of the bankruptcy estate with the intent to hinder, delay or defraud creditors and that such concealment continued from when the transfers were initially made to within the one year period prior to the Petition Date and at times even into the postpetition period. In addition, the Defendant's discharge should be denied under § 727(a)(5) due to the Defendant's failure to satisfactorily explain any loss of assets or deficiency of his assets to meet his liabilities.

At the end of Plaintiffs' presentation of its case in chief, Defendant made an oral motion for directed verdict that the Plaintiff's causes of action under 11 U.S.C. § 727(a)(2)(A) should be dismissed on the basis that the Plaintiffs have failed to prove that the Defendant transferred, removed, destroyed, mutilated, or concealed property within one year prior to the Petition Date and that the doctrine of continuous concealment is inapplicable to this case and should not be applied to extend the one-year look back period (the "Motion for Directed Verdict").

ISSUE

In spite of the facts provided by the Plaintiffs in support of their arguments, the Defendant seeks dismissal of this adversary proceeding primarily based on the arguments that

the Plaintiffs have failed to prove that (1) the Defendant transferred, removed, destroyed, mutilated, or concealed property within one-year prior to the Petition Date as required by statute, especially with respect to the Residence because legal title to the Residence was transferred back to a tenancy by the entirety two days prior to the Petition Date, and (2) the doctrine of continuous concealment is inapplicable to this case and should not be applied to extend the one-year look back period.  Plaintiffs argue that the facts of this case reveal an attempt at continuous concealment which was never intended to be condoned, or be the basis for preventing the court from finding that a defendant violated section 727(a)(2)(A).  In order to properly deal with the Defendant's Motion for Directed Verdict, the parties were granted time to file briefs regarding the issue as to whether the doctrine of continuous concealment should apply to permit the Court to examine the Defendant's prepetition activities beyond the one-year requirement under section 727(a)(2)(A).

## DISCUSSION

Defendant's motion for directed verdict in a bench trial is treated as a motion for a judgment on partial findings under Rule 52(c) of the Federal Rules of Civil Procedure. *Eddenfeld v. Schultz (In re Schultz)*, 239 B.R. 664, 666 (E.D.N.Y. 1999). Rule 52(c) as made applicable by Bankruptcy Rule 7052 provides that:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

Fed. R. Civ. P. 52(c). In order for a plaintiff to defeat a defendant's motion for a directed verdict

dismissing an adversary proceeding, the record at the close of the plaintiff's case-in-chief must establish a prima facie case under at least one of the allegations upon which the plaintiff's complaint is based. *Dunkerton Co-operative Elevator v. Bakker et al. (In re Bakker)*, No. 04-9098, 2006 Bankr. LEXIS 107 (Bankr. N.D. Iowa Jan. 27, 2006).

FSB and the Trustee seek a determination that the Defendant's discharge should be denied under 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(5). Pursuant to section 727(a)(2)(A), a debtor is denied a discharge if:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed –
> (A) property of the debtor, within one year before the date of the filing of the petition . . . .

11 U.S.C. § 727(a)(2)(A). The party challenging a debtor's discharge has the burden of proving that denial of discharge is warranted by the preponderance of evidence. *In re Boyer*, 328 Fed. Appx. 711, 714 (2d Cir. 2009). If the challenging party meets its burden, then the burden shifts to the debtor "to provide a satisfactory explanation for his actions." *New World Restaurant Group, Inc. v. Abramov (In re Abramov)*, 329 B.R. 125, 130 (Bankr. E.D.N.Y. 2005).

Defendant argues that the Plaintiffs' case must fail because there is no transfer, removal, destruction, mutilation or concealment of the debtor's property within one year of the Petition Date. The Stepdenn Agreement, whereby the Defendant sold his interest in his profit and loss participation at Schoenfeld for the 2009 and 2010 years was dated December 19, 2009. The Defendant's transfer of his legal interest in his Residence to Dorfman occurred on March 22, 2010. Both of these transfers took place more than one year from the Petition Date of December 12, 2011. In addition, the Defendant argues even if he is deemed to have concealed his interest

in the Residence during the one year period prior to the Petition Date, the fact that he had the legal interest in the Residence transferred back into his name prior to his filing for bankruptcy and disclosed his interest in the Residence in his bankruptcy schedules would argue against concealment of his interest in the Residence for purposes of a denial of discharge under section 727(a)(2)(A).

FSB and the Trustee argue that the one year requirement embodied in section 727(a)(2)(A) should be loosened under the doctrine of "continuous concealment". "Concealment refers to placing assets beyond the reach of creditors or withholding pertinent information, and need not involve an actual transfer." *McCarthey Investments LLC et al. v. Shah (In re Shah)*, No. 08-01762, 2010 Bankr. LEXIS 1621, *20 (Bankr. S.D.N.Y. May 13, 2010). "Under the "continuous concealment' doctrine, a concealment will be found to exist during the year before bankruptcy even if the initial act of concealment took place before this one year period as long as the debtor allowed the property to remain concealed into the critical year." *Boyer*, 328 Fed. Appx. at 714 (*quoting Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993)); *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 555 (5th Cir. 1987). The doctrine "recognizes that concealment or retention of an equitable interest in property by the Defendant with the intent to defraud creditors may occur within the year before filing the petition even though the property was transferred prior to the one year time frame." *Minsky v. Silverstein (In re Silverstein)*, 151 B.R. 657, 661 (Bankr. E.D.N.Y. 1993). Thus, there needs to be a concealment of the debtor's interest in property that continues into the one year period prior to the debtor's bankruptcy and an intent by the debtor to hinder, delay or defraud at least one creditor or an officer of the estate to bring the concealment within reach of section 727(a)(2)(A). *In re O'Brien*, 190 B.R. 1, 9-10

(Bankr. D. Mass. 1995).

The doctrine "seeks to prevent a debtor from 'represent[ing] to the world that the debtor has transferred away all his interest in property while in reality he retained some secret interest.'" *Doubet, LLC v. Palermo (In re Palermo)*, 370 B.R. 599, 615 (Bankr. S.D.N.Y. 2007)(*quoting Rosen v. Bezner*, 996 F2d at 1532)). A continuing concealment typically involves "(1) the transfer of property by a debtor who still retains a beneficial or equitable interest in the property; and (2) the debtor's continuing to treat the property in the same manner after the transfer as before the transfer."*Palermo*, 370 B.R. at 612 (*quoting Bank of Chester County v. Cohen*, 142 B.R. 720, 726 (E.D. Pa. 1992)); *The Cadle Co. v. Prupis (In re Prupis)*, No. 05-2674, 2007 Bankr. LEXIS 323, *30 (Bankr. D.N.J. Jan. 24, 2007)(finding a continuous concealment of the debtor's partnership interest in a law firm where the debtor surrendered his stock in the firm around the time his financial troubles began but continued to receive profits from the firm after the stock was surrendered); *Good v. Kantorik (In re Kantorik)*, 475 B.R. 233 (Bankr. W.D. Pa. 2012)(finding continuous concealment where debtor no longer maintained any bank account in his name and all of the expenses are paid out of the wife's account, cashed checks using the cash drawer at the family accounting practice, and transferred the accounting practice to his son who is not a CPA but continued to use the practice to generate cash income); *Penner v Penner (In re Penner)*, 107 B.R. 171 (Bankr. N.D. Ind. 1989)(finding continuous concealment where a debtor transferred his ownership interest in a dairy farm to his wife but continued to work and manage the farm as he did prior to the transfer and the income from the farm was used to pay the personal expenses of the debtor and his wife).

In the case of residential real property, as in this case, "[w]here a debtor makes all

mortgage, insurance, and maintenance payments on and lives in property owned by another, he may be found to have fraudulently concealed his interest by maintaining the property in the other's name." *Silverstein*, 151 B.R. at 661. See also *In re Keeney*, 227 F.3d 679 (6th Cir. 2000); *Olivier*, 819 F.2d at 554; *O'Brien*, 190 B.R. at 4.

Whether a debtor had actual intent to hinder, delay, or defraud a creditor is rarely proven by direct evidence and thus, courts look to see if certain "badges of fraud," which are strong indicia of actual fraudulent intent, are present. *In re Boyer*, 328 Fed. Appx. at 715 (*citing Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582 (2d Cir. 1983)). These "badges of fraud" include:

    (1)    the lack or inadequacy of consideration;
    (2)    the family, friendship or close associate relationship between the parties;
    (3)    the retention of possession, benefit or use of the property in question;
    (4)    the financial condition of the party sought to be charged both before and after the transaction in question;
    (5)    the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
    (6)    the general chronology of the events and transactions under inquiry.

*Kaiser*, 722 F.2d at 1582-83. As noted by the Second Circuit Court of Appeals in *Kaiser*, "[t]he transfer of property by the debtor to his spouse while insolvent, while retaining the use and enjoyment of the property, is a classic badge of fraud. *Id.*, 722 at 1583.

Here, the Court finds that evidence supporting the finding of badges of fraud have been presented to the Court. In addition, evidence has been presented indicating that the Defendant engaged in a series of transfers and transactions relating to his interest in personal and real property that had the effect of hindering, delaying or defrauding FSB after Imaging defaulted on the line of credit on September 1, 2008. The Defendant had Ellen open the 6052 Account and the

New Horse Account under her own name and conducted banking transactions through those accounts. After FSB commenced the State Court Action in July 2009, the Defendant closed the joint checking 8221 Account and the Old Horse Account under his name. After the closure of the bank accounts in the Defendant's name up to the Petition Date, the Defendant did not have any account in his own name other than a brief period where the Defendant opened a joint checking account with Ellen solely for the purpose of depositing a tax refund check made payable to both of them and which account was closed soon after the refund was deposited and the funds transferred. After September 2009, the Defendant paid his personal and household expenses from the accounts in Ellen's name. Although the Defendant asserts that the purpose of having Ellen open up accounts in her own name was to have her learn to handle the family's finances, there is no evidence that she did anything different than what she had done prior to her signing the Power of Attorney to the Defendant. There is no reason why Ellen could not have taken over the finances with the couple's joint 8221 Account rather than having all funds in the bank accounts be put into her name solely. Moreover, the conduct with respect to the family's banking did not change after the Ellen 6052 Account and the New Horse Account were opened. Ellen acknowledged that she did not write checks, nor did she read any of the bank statements. Clearly, it is the Defendant who wrote the checks and used the bank accounts for his purposes under the guise of the Power of Attorney from Ellen.

Defendant transferred the legal title in the Residence to his step-brother, Mr. Dorfman, and Ellen in March of 2010. Other than having a legal interest in the Residence, Mr. Dorfman never resided at the Residence. Notwithstanding the transfer, the Defendant continued to reside at the Residence and continued to pay the mortgage, real estate taxes, and insurance on the

property while taking deductions for the mortgage interest and property taxes on his tax returns. Defendant also continued to pay for the upkeep of the Residence.

While legal title in the Residence was transferred back to the Defendant and Ellen two days prior to the Petition Date and the Residence is listed in the Defendant's bankruptcy schedules, the Court finds that the Defendant's argument that the Defendant's interest in the Residence was not concealed unpersuasive. The Ninth Circuit and Eleventh Circuit, which have examined the issue of whether a retransfer of property to the debtor of property that was previously transferred to another prevents denial of discharge under § 727(a)(2)(A), decided the issue differently.

The Ninth Circuit in *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339 (9th Cir. 1986) held "transferred" as used in section 727(a)(2)(A) to mean "transferred and remained transferred" as being consistent with the legislative purpose of section 727(a)(2)(A) of denying discharge to debtors who hide their assets until obtaining a discharge in bankruptcy or who destroy their assets. The Ninth Circuit reasoned that this interpretation of "transferred" to encourage honest debtors to recover property they previously transferred and to allow them to undo their mistakes and receive a discharge.

> It is not uncommon for an uncounseled or poorly counseled debtor faced with mounting debts and pressure from creditors to attempt to protect his property by transferring it to others. Upon later reflection or upon obtaining advice from experienced bankruptcy counsel, the debtor may realize that his original transfer of the property was a mistake. If the debtor is informed that his mistake bars him from a discharge in bankruptcy, he will have no incentive to attempt to recover the property or reveal its existence to his creditors. Rather, he will have a strong incentive to continue to hide his assets.

*Id.*, 787 F.2d 1345. In permitting a discharge, the Ninth Circuit would require the reconveyance of the fraudulently transferred property to take place prepetition. *In re Kablaoui*, 196 B.R. at

709.

Conversely, the Eleventh Circuit in *Davis v. Davis (In re Davis)*, 911 F.2d 560, 562 (11th Cir. 1990), found the statutory language of section 727(a)(2)(A) to be unambiguous and that a court should interpret a statute in a manner consistent with the plain meaning used in the statute. Finding that Congress is capable of drafting a statute which would deny a discharge only when assets were fraudulently transferred and remained transferred if it chose to do so, the Eleventh Circuit rejected the "transferred and remained transferred" approach taken by the Ninth Circuit and affirmed the denial of the debtor's discharge under section 727(a)(2)(A) where the debtor fraudulently conveyed his interest in his home to his wife upon the advice of counsel and then reversed the transfer upon the advice of experienced bankruptcy counsel a day before filing for bankruptcy.

This Court finds that although the Defendant's legal interest in the Residence was reconveyed back to him two days prior to the Petition Date, the Defendant, who is a sophisticated business person, has not been shown to be an honest debtor that mistakenly transferred his interest in the property and sought to reconvey the transferred property in order to correct his mistake. At the time of the Defendant's transfer of the Residence to Dorfman, an insider, Defendant was represented by counsel in the State Court Action. The same firm representing the Defendant in the State Court Action is also the same firm that drafted the sale contract for the transfer to Dorfman, the Stepdenn Agreement and the Peters Agreement, and such firm also has an experienced bankruptcy practice.  Accordingly, the Defendant did not mistakenly transfer his interest in the Residence because he did not have counsel or was poorly counseled from an attorney unfamiliar with bankruptcy law. Moreover, the Defendant admitted

that the reconveyance of the legal title in the Residence was not to correct an error but because a proposed buyer of the Residence had problems obtaining clear legal title to the Residence. Accordingly, the Court, under such facts and circumstances, finds that the reasoning behind the Ninth Circuit's decision in *Adeeb* is not applicable to this case. Given that the Eleventh Circuit rejects the debtor's subsequent reconveyance as a defense to a denial of discharge under section 727(a)(2)(A), the Court is not persuaded that such a defense should apply in this case.

## CONCLUSION

Based upon the foregoing, the Court finds that the doctrine of continuous concealment to be applicable to this case as the Defendant is a sophisticated businessman who is represented by knowledgeable bankruptcy and commercial litigation counsel. Plaintiffs have established a prima facie case with respect to a 11 U.S.C. section 727(a)(2)(A) cause of action. Thus, the Court must deny the Defendant's Motion for Directed Verdict. However, the Court is not making a final ruling on the Plaintiffs' 11 U.S.C. section 727(a)(2)(A) and section 727(a)(5) claims. Rather, the Court determines that it is appropriate that the Defendant be given an opportunity to present his evidence to rebut the Plaintiffs' prima facie case with respect to 11 U.S.C. section 727(a)(2)(A) and the 11 U.S.C. section 727(a)(5) cause of action.

Accordingly, the trial shall continue on November 4, 2013 at 2:00 p.m.

Dated: Central Islip, New York
September 26, 2013

*Dorothy Eisenberg*
**Dorothy Eisenberg**
**United States Bankruptcy Judge**